# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2620-18T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

J.B.,

      Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF D.R., Jr.,

      A Minor.

_____

      Argued March 4, 2020 – Decided March 11, 2020

      Before Judges Haas, Mayer and Enright.

      On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FG-20-0045-18.

      Anne E. Gowen, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender,

attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Anne E. Gowen, on the briefs).

Samuel Fillman, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jane C. Schuster, Assistant Attorney General, of counsel; Samuel Fillman, on the brief).

Noel Christian Devlin, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Noel Christian Devlin, of counsel and on the brief).

PER CURIAM

Defendant J.B.,[1] the biological mother of D.R., Jr. (Daniel), born in March 2017, appeals from the Family Part's February 5, 2019 judgment of guardianship terminating her parental rights to the child.[2] Defendant contends that the Division of Child Protection and Permanency (Division) failed to prove prongs three and four of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. Defendant also alleges that her trial attorney did not provide her with effective legal assistance. The Law Guardian supports the determinations on appeal as it did before the trial court.

---

[1] We refer to the adult parties and family members by initials, and to the child by a fictitious name, to protect their privacy. R. 1:38-3(d)(12).

[2] The child's biological father has never been identified. However, the judgment also terminated the parental rights of "The Biological Father, Whomsoever He May Be." This portion of the judgment is uncontested in this appeal.

2

Based on our review of the record and applicable law, we are satisfied that the evidence in favor of the guardianship petition overwhelmingly supports the decision to terminate defendant's parental rights, and that defendant's attorney provided her with effective representation. Accordingly, we affirm substantially for the reasons set forth in Judge James Hely's thorough and thoughtful oral decision rendered on February 5, 2019.

We incorporate by reference the factual findings and legal conclusions contained in Judge Hely's decision, and add the following comments. The hospital where Daniel was born contacted the Division shortly after the child and defendant tested positive for opiates at the time of the child's birth. Defendant admitted to taking heroin during her pregnancy and, as a result, Daniel suffered from withdrawal symptoms and had to be cared for in the neonatal intensive care unit for several weeks. Prior to the hospital's release of the child, the Division conducted an emergency removal and obtained custody of Daniel. Defendant later stipulated that she abused or neglected Daniel within the intendment of N.J.S.A. 9:6-8.21(c) "by using drugs during her pregnancy which [caused] the child to be born positive for the same and experience withdrawal symptoms."

The Division placed the child with defendant's mother, K.W. in March 2017. Both defendant and her mother knew that defendant's contact with the baby had to be supervised. However, the Division soon learned that K.W. had permitted defendant to have unsupervised contact with Daniel on multiple occasions when K.W. was away from her home. David Kumar, a Division caseworker, testified that K.W.'s failure to abide by the visitation order allowed defendant, who was still using drugs, to breastfeed the baby during K.W.'s absences. Kumar stated that K.W. also failed to advise the Division that her employer had terminated her and it was likely she would soon have to move to a smaller apartment. Based upon the safety concerns raised by these disclosures, the Division removed Daniel from K.W.'s care and placed him with the resource parent with whom he has lived ever since.

The Division attempted to work with defendant to address her severe substance abuse problem so she could reunite with Daniel. The Division referred defendant to Dr. Allison Strasser Winston, who was qualified at trial as an expert in the field of psychology with an emphasis on parental fitness and bonding, for an evaluation. Dr. Winston testified that defendant used opiates prior to her pregnancy, during her pregnancy, and continued to use them after Daniel was removed from her care. Under these circumstances, Dr. Winston

opined that defendant could not provide the child with a safe and stable environment at that time, and lacked the parenting skills necessary to care for a baby.

Based upon Dr. Winston's examination, the Division referred defendant for substance abuse evaluations, but she missed several scheduled appointments. In July 2017, defendant did attend a short-term "detox" program for five days, but declined to attend or complete the follow-up long-term program. Defendant did not cooperate with any further services.

The Division arranged for defendant to have weekly, supervised visits with Daniel at the Division's office. However, defendant's attendance at these visits was sporadic. After seeing the child on February 26, 2018, defendant did not visit Daniel again until January 2019, shortly before the trial began.

During this period, defendant essentially disappeared. The Division attempted to find her at her last known addresses, but was unable to do so. On May 25, 2018, the Division contacted K.W., who was now living in North Carolina, but K.W. denied knowing anything about her daughter's whereabouts or circumstances. The Division later learned that defendant had become pregnant and had given birth to a daughter in April 2018. At a court appearance,[3]

---

[3] Defendant tested positive for opiates and methadone at this court appearance.

defendant told the Division that K.W. had taken her to North Carolina two months before the baby's birth so she could "get clean." After the baby was born, defendant left her in K.W.'s care when she returned to New Jersey. Thus, K.W. obviously knew where defendant was when the Division called seeking to find defendant. Defendant stated she hid the baby from the Division to prevent the agency from seeking custody of the child.

Because the Division's plan for Daniel had changed from reunification with defendant to the termination of her parental rights, the Division attempted to arrange a bonding evaluation between defendant and her son. The evaluation was scheduled three times, but defendant failed to appear for any of these appointments.

In November 2018, the Division submitted an Interstate Compact on the Placement of Children (ICPC) home assessment request for K.W.'s home in North Carolina because she had indicated she might be interested in serving as a caregiver for Daniel. The assessment was still pending at the time of the February 2019 trial. The Division also assessed several other relatives as potential placements, but all were ruled out.

Dr. Winston conducted a bonding evaluation between the resource parent and Daniel. Dr. Winston opined that the child had "a strong and secure

emotional attachment to the resource parent which is the best kind to have." Dr. Winston stated that the resource parent was Daniel's "psychological parent," who is "the person that he views as his mother and to disrupt that relationship would be very traumatic to him." Dr. Winston explained that if the bond between the resource parent and Daniel was broken, he would suffer emotional problems; "might regress with some of the developmental skills that he had achieved"; would "likely become very withdrawn [and] insecure"; and "might exhibit behavioral [and] [c]ognitive issues." She further opined that "disrupting an attachment relationship at such an early age could impact on [Daniel's] ability to develop future attachment relationships because he's afraid to trust other people because he's afraid that this could happen again."

Defendant did not call an expert to contest any of Dr. Winston's conclusions, and she did not testify on her own behalf[4] or present any other witnesses. K.W. was present at the trial but, even though she was on defendant's witness list, she did not testify when given the opportunity to do so.

In his comprehensive opinion, Judge Hely reviewed the evidence presented at the trial, and concluded that (1) the Division had proven all four

---

[4] On the day the trial began, defendant tested positive for opiates, cocaine, amphetamine, and methamphetamine.

prongs of the best interests test by clear and convincing evidence, N.J.S.A. 30:4C-15.1(a); and (2) termination of defendant's parental rights was in Daniel's best interests. In this appeal, our review of the trial judge's decision is limited. We defer to his expertise as a Family Part judge, Cesare v. Cesare, 154 N.J. 394, 413 (1998), and we are bound by his factual findings so long as they are supported by sufficient credible evidence. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (citing In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)).

Applying these principles, we conclude that Judge Hely's factual findings are fully supported by the record and, in light of those facts, his legal conclusions are unassailable. We therefore affirm substantially for the reasons that the judge expressed in his well-reasoned opinion, and briefly address the following matters.

In Point I of her brief, defendant argues that the trial court "abandoned its obligation to independently assess the reasonableness of [the Division's] May 2017 decision to remove Daniel from his grandmother's home." In making this argument, defendant points to a single sentence in the lengthy portion of the judge's oral opinion where he addressed the question of whether the May 2017 change of placement was appropriate under the circumstances. There the judge

stated, "[a]nd, I don't think it's the [c]ourt's . . . province to second guess that decision making."  Based solely upon this one sentence, defendant asserts Judge Hely failed to independently review and determine whether the Division had established a valid reason for its decision to change Daniel's placement after it discovered that K.W. had left the child unsupervised with defendant on multiple occasions and did not disclose that she no longer had a job.  Instead, defendant argues that the judge "inappropriately delegated responsibility to the [Division] on the question of the sufficiency of the [Division's] own evidence[.]"

We conclude that defendant's argument lacks merit because it ignores the fact that the judge's remark was part of a much longer discussion where the judge identified the factors cited by the Division to support a change in Daniel's placement, thoroughly analyzed those factors, and correctly concluded that the Division's decision was amply supported by the record.

In his oral decision, Judge Hely stated:

> Mr. Kumar [the Division's caseworker] testified that the baby was first placed with maternal grandmother, [K.W.]  [K.W.] had the child in her care up through . . . May 2017.  However, the Division found several aspects of that placement . . . led to concerns about the safety of the child and the child was removed and placed in the present resource home where [Daniel] has been since May 26, 2017 at the age of two months.  Specifically, the Division's concerns about the maternal grandmother were that [defendant's] time with the child

9

was not being supervised by the grandmother as had been ordered by the court. Also, the [Division] was concerned about [K.W.] being untruthful about her employment status. In addition, there [were] concerns about [K.W.] abusing alcohol.

Now, the Division has a statutory obligation to search for possible relatives for placement and that's under N.J.S.A. 30:4C-12.1. And they did that specifically in this case. And I find that that was appropriate. But the removal from the grandmother['s] ca[r]e in May was also appropriate given the concerns that the Division had. And I don't think it's the [c]ourt's . . . province to second guess that decision making. They had concerns about the safety and health of the child and therefore I . . . find [s]pecifically that the Division met its obligations to seek relatives in addition to other evidence we have on other relatives. And in fact, the Division has continued to explore the possibility of placement with the maternal grandmother, that same one who had the child for the initial two months of his life. And the Division has done that by sending out to North Carolina for a[n] assessment of the home by interstate compact.

[(Emphasis added).]

As is readily apparent from the above quote, the judge did not "abandon" his "obligation to independently assess the reasonableness of the [Division's] May 2017 decision to remove Daniel from his grandmother's home." He fulfilled his duty to provide the parties with a clear statement of his own findings of fact and conclusions of law. See R. 1:7-4 (requiring the trial judge to "find

the facts and state [his or her] conclusions of law thereon in all actions tried without a jury").

Thus, read in the proper context, the judge was merely observing that the Division's proofs on the issue, which were uncontradicted by defendant at trial, were so overwhelming that he had no basis to make a contrary determination. If this point were not already clear, the judge made additional findings concerning the issue later in his decision. For example, the judge also found:

> The defense has contended that the child should be placed with the maternal grandmother at this late date, in spite of the fact that the baby was removed from her care way back in May 2017 for what the . . . [c]ourt finds to be legitimate reasons. It was not unreasonable under the circumstances for the Division to change the placement at that time.

The judge continued by stating:

> The credible evidence with respect to the third prong is that the Division has made more than reasonable efforts to provide services that have not been taken advantage of by [defendant]. Given the length of time the child has been in the loving resource home I do not find that there is an alternative given our stated goal of permanent placement.

Because defendant has misread the judge's decision, which plainly stated the basis for his conclusion that the Division had ample grounds to change Daniel's placement in May 2017, we reject defendant's contrary contention.

Turning to Point III of defendant's brief, she next asserts that in terminating defendant's parental rights to Daniel, the judge failed to consider the harm the child would suffer from the likely "severance of Daniel's relationship with his baby sister." Defendant's argument is based on her view that the Division should have re-placed Daniel with K.W. after defendant gave birth to a new baby in April 2018, despite the fact that (1) the Division had previously, and appropriately, removed the child from K.W.'s care in May 2017 based upon the legitimate concerns it had concerning her ability to care for him; and (2) both defendant and K.W. hid the new baby's birth from the Division. This contention lacks merit.

When the Division accepts a child into its care or custody, it must "initiate a search for relatives who may be willing and able to provide the care and support required by the child." N.J.S.A. 30:4C-12.1(a). We have long recognized "the Division's policy to place children with relatives whenever possible." N.J. Div. of Youth & Family Servs. v. M.F., 357 N.J. Super. 515, 527 (App. Div. 2003). Yet, "there is no presumption in favor of placement with relatives[.]" N.J. Div. of Youth & Family Servs. v. K.L.W., 419 N.J. Super. 568, 580 (App. Div. 2011). Nonetheless, the Division may not seek termination

of parental rights and adoption by foster parents without first exploring available relative placements. Ibid.

The Division's statutory obligation requires prompt identification of relatives and notice to them of the results of any investigation. Ibid. This "obligation does not permit willful blindness and inexplicable delay" in the approval or disapproval of a relative known to the Division. Id. at 582. New Jersey, however, has a strong public policy in favor of permanency. In re Guardianship of K.H.O., 161 N.J. 337, 357 (1999). A delay in permanency based on the Division's failure to comply with statutory obligations is warranted only when it is in the child's best interests. K.L.W., 419 N.J. Super. at 581-83. Thus, the trial court ultimately must determine whether placement with the relative serves the child's best interests. Id. at 581; M.F., 357 N.J. Super. at 528.

However, we have viewed the Division's obligations under N.J.S.A. 30:4C-12.1 as an additional aspect of the four-prong "best interests" test in N.J.S.A. 30:4C-15.1(a). Ibid. "[A]ssessment of relatives is part of the Division's obligation to consult and cooperate with the parent in developing a plan for appropriate services that reinforce the family structure." K.L.W., 419 N.J. Super. at 583 (citing N.J.S.A. 30:4C-15.1(c)(1)). If the Division "fails to comply with its obligation [under N.J.S.A. 30:4C-12.1], the judicial

13

determinations that follow are made without information relevant to the best interests of the child." Id. at 581. However, even when the Division fails to comply with that obligation, "[d]elay of permanency or reversal of termination . . . is warranted only when it is in the best interests of the child." Ibid.

Applying these principles, we are unpersuaded that the Division failed to fulfill its obligations under N.J.S.A. 30:4C-12.1 or that a remand is required as suggested by defendant. Contrary to defendant's contention, "[t]he reality is that, no matter how fit or willing a proposed relative may be, a child will, in some instances, be better off remaining in a successful foster placement." N.J. Div. of Youth & Family Servs. v. J.S., 433 N.J. Super. 69, 85 (App. Div. 2013).

That is clearly the case here. As discussed above, the Division determined in May 2017 that K.W. was not an appropriate placement for Daniel and, as Judge Hely correctly found, the record amply supports that decision. While K.W. belatedly expressed an interest in again being considered as a placement alternative, her request came much too late in the process. As the uncontradicted psychological expert testimony presented at trial demonstrated, Daniel is firmly bonded with his resource parent, who has cared for him since May 2017. The resource parent is Daniel's psychological parent and we discern no basis for

14

disturbing Judge Hely's reasoned determination that separating the child from her would clearly harm the child.

In making this decision, the judge recognized that Daniel has a new sister, who he does not know, but determined that this was not a sufficient reason to forestall a decision on the termination of defendant's parental rights. Nothing in the record indicates that it would be in Daniel's best interests to delay permanency. Daniel is entitled to a permanent, safe, and secure home. We acknowledge "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). As public policy increasingly focuses on a child's need for permanency, "[t]he emphasis has shifted from protracted efforts for reunification with a birth parent to an expeditious, permanent placement to promote the child's well-being." Ibid. (citing N.J.S.A. 30:4C-11.1). That is because "[a] child cannot be held prisoner of the rights of others, even those of his or her parents. Children have their own rights, including the right to a permanent, safe and stable placement." Ibid.

Here, the judge properly focused on Daniel's best interests, rather than those of defendant or K.W., who is not a party to this action. Because the judge

15

correctly weighed the benefits against the harms of a termination judgment as required by N.J.S.A. 30:4C-15.1(a)(4), and concluded that Daniel deserves permanency at this point in his young life, we affirm the judgment terminating defendant's parental rights.

In so ruling, we reject defendant's arguments in Point II of her brief that her trial counsel did not provide her with effective legal representation. To establish an ineffective assistance of counsel claim in matters involving the termination of parental rights, a defendant must meet the two-prong test established in Strickland v. Washington, 466 U.S. 668, 687 (1984), which requires a showing that trial counsel's performance was deficient and that, but for the deficient performance, the result would have been different. N.J. Div. of Youth & Family Servs. v. B.R., 192 N.J. 301, 307-09 (2007) (citing Strickland, 466 U.S. at 687, 694). The defendant bears the burden of demonstrating a constitutional violation, as the court will presume that counsel acted competently. United States v. Chronic, 466 U.S. 648, 658 (1984). Defendant has failed to meet that burden here.

Defendant baldly argues that her attorney did not adequately review the Division's records and, as a result, neglected to introduce a number of documents that she asserts would have bolstered her claim that the Division erred in

changing Daniel's placement in May 2017.[5] However, while these records confirm that prior to moving the child to his current home, nothing seemed amiss at K.W.'s residence, they also reinforce the testimony of the Division's two caseworkers that, among other things, the Division discovered that K.W. violated the terms of the safety protection plan by allowing defendant to have unsupervised access to the child. Contrary to defendant's unsupported claim that Kumar unilaterally removed the child from K.W.'s care in a "fit of pique," the documents further demonstrate that the Division adequately documented its reasons for this change of placement. Under these circumstances, we discern no basis for second-guessing defense counsel's tactical decision not to attempt to rely upon these documents.

Defendant also argues that her trial attorney was ineffective because she did not make a request that North Carolina expedite its home assessment review of K.W.'s residence, or should have argued that an assessment was not required. However, any request to expedite or end the review process would not have altered the fact that by the time K.W. belatedly attempted to re-enter the picture, Daniel was firmly bonded with his resource parent. As discussed above, the

---

[5] Defendant filed a motion to supplement the record with these documents and we now grant that motion.

unrebutted expert testimony showed that the child would suffer enduring harm if that bond were broken.  Therefore, we reject defendant's contention on this point.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

18